NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

ERICA H., *Appellant*,

*v.*

DEPARTMENT OF CHILD SAFETY, I.B., *Appellees*.

No. 1 CA-JV 19-0101
FILED 12-17-2019

Appeal from the Superior Court in Maricopa County
No. JD36650
The Honorable Karen A. Mullins, Judge

**REVERSED**

COUNSEL

Law Office of H. Clark Jones, LLC, Mesa
By H. Clark Jones
*Counsel for Appellant*

Arizona Attorney General's Office, Tucson
By Autumn Spritzer
*Counsel for Appellee DCS*

---

**MEMORANDUM DECISION**

Judge Diane M. Johnsen delivered the decision of the Court, in which Presiding Judge Kenton D. Jones and Judge James B. Morse Jr. joined.

---

**J O H N S E N**, Judge:

¶1 Erica H. ("Mother") appeals the superior court's order adjudicating her seven-year-old child, I.B., dependent. Because no reasonable evidence supported a finding that I.B. was dependent at the time of the adjudication hearing, we reverse.

**FACTS AND PROCEDURAL BACKGROUND**

¶2 On November 9, 2018, Mother called police after she and her ex-boyfriend had an altercation. When officers arrived, Mother appeared paranoid and anxious. I.B.'s grandmother checked Mother into a crisis-rehabilitation center. Mother then was transferred for a court-ordered evaluation in a behavioral-health hospital, where she tested positive for marijuana and was diagnosed with bipolar disorder. On November 16, the Department of Child Safety ("DCS") interviewed Mother at the hospital. She expressed fear that people were watching her through cameras in her home and were poisoning her food and drink. Mother admitted to DCS that she used marijuana with her ex-boyfriend a few times. Mental-health professionals described Mother's state as a manic episode with psychotic symptoms, and during her stay, Mother received medications. DCS took custody of I.B.

¶3 In the hospital, Mother's condition improved, and she expressed a willingness to engage in voluntary mental-health treatment. On November 26, another division of the superior court declined to order involuntary treatment and dismissed her mental-health case. Mother therefore was released from the hospital, which recommended that she continue taking two medications and follow up with mental-health services through Partners In Recovery ("PIR").

¶4 Mother kept her initial appointments with PIR. She stopped taking her medication, however, and did not participate with PIR from December 5, 2018 to January 23, 2019. After January 23, Mother reengaged with PIR and continued participating through the time of the dependency

2

hearing on March 7, 2019. A mental-health assessment at PIR on January 27 gave her a moderate depression score and recommended further assessment for depression and substance abuse.

¶5 In the meantime, DCS referred Mother for substance-abuse testing. Mother consistently tested negative, except for an initial test indicating a declining marijuana metabolite and a test on February 19 that returned positive for ETG, indicating the presence of alcohol. By way of explanation, Mother provided a letter from her employer describing a wine tasting her employer had required her to participate in at work. Mother also participated in visits with I.B. through the child's placement and maintained stable employment and housing.

¶6 After a contested dependency adjudication hearing, the superior court issued a ruling adjudicating I.B. dependent due to neglect. Mother timely appealed the dependency order. We have jurisdiction pursuant to Article 6, Section 9, of the Arizona Constitution, and Arizona Revised Statutes ("A.R.S.") sections 8-235(A) (2019), 12-120.21(A)(1) (2019), and -2101(A)(1) (2019).[1]

## DISCUSSION

¶7 On appeal, Mother concedes that she "act[ed] irrationally" and out of a "state of paranoia" in November 2018 due to "marijuana use, coupled with stressful circumstances with her significant other and her mother." She maintains, however, that her paranoia – and thus the facts

---

[1] Absent material revision after the relevant date, we cite the current version of a statute or rule.

In September 2019, roughly six months after the dependency adjudication, the superior court dismissed the dependency at the suggestion of DCS, relinquished jurisdiction of Mother and I.B. to the family division of the superior court and entered a temporary order granting Mother sole legal decision-making over I.B. Upon receipt of that order, this court asked the parties to show cause why this appeal should not be dismissed as moot. Mother objected to dismissal, asserting she feared that unless the one-time dependency order is reversed or vacated, it might cause her to be placed on the Department of Economic Security's Central Registry of persons who have neglected or abused children. *See* A.R.S. § 8-804 (2019); *see also* A.R.S. § 8-533(B)(11) (2019) (prior dependency may be considered in a severance best-interests analysis).

supporting a dependency in this case – dissipated by late November 2018, around the time the court dismissed her mental-health case.

¶8         We review the court's dependency determination for an abuse of discretion and will affirm unless no reasonable evidence supports the court's findings. *Louis C. v. Dep't of Child Safety*, 237 Ariz. 484, 488, ¶ 12 (App. 2015). The superior court "is in the best position to weigh the evidence, observe the parties, judge the credibility of witnesses, and resolve disputed facts." *Ariz. Dep't of Econ. Sec. v. Oscar O.*, 209 Ariz. 332, 334, ¶ 4 (App. 2004). The superior court may find a child dependent by a preponderance of the evidence. *Louis C.*, 237 Ariz. at 490, ¶ 23. A dependent child is one who is adjudicated to be "[i]n need of proper and effective parental care and control and who has no parent . . . willing to exercise or capable of exercising such care and control." A.R.S. § 8-201(15)(a)(i) (2019). The superior court "must consider the circumstances as they exist at the time of the dependency adjudication hearing in determining whether a child is a dependent child." *Shella H. v. Dep't of Child Safety*, 239 Ariz. 47, 48, ¶ 1 (App. 2016).

¶9         Here, the superior court based its dependency ruling on its finding that "Mother's use of marijuana together with her mental health issues create paranoia and anxiety rendering Mother unable to provide adequate parental supervision or protective capacity regarding the child." There is little question that Mother was unable to supervise or otherwise parent I.B. while she was suffering from paranoia-like symptoms in November 2018. Doctors noted that Mother then exhibited illogical thoughts, persecutory delusions, and symptoms of mania, including anxiety, hypervigilance and racing thoughts. The issue, however, is whether the record supports a finding that I.B. lacked a parent able and willing to exercise effective parental care and control at the time of the dependency adjudication in March 2019.

¶10         According to the record, Mother's condition improved during her hospitalization, and she told providers she wanted to continue with voluntary treatment upon her release. Based in part on Mother's willingness to engage in voluntary mental-health treatment, another division of the superior court dismissed a petition for further court-ordered treatment. Once home, Mother kept her initial appointments with PIR, but she testified she objected to the side effects of the medications the hospital prescribed, and preferred to pursue counseling instead. Consistent with Mother's account, the record of her intake appointment at PIR shows that she told the physician that she was not taking her medications and the physician explained to her the "[p]otential risks, benefits and side effects"

of the medications and concluded that Mother "understood and made an informed decision."

¶11 Mother did not immediately return to PIR after her intake appointment, and PIR's records reflect that she explained her AHCCCS coverage had expired and she needed to accumulate 30 days of paystubs to reapply. Despite PIR's outreach attempts, Mother did not participate with PIR between December 5, 2018 and January 23, 2019, although she testified she continued to participate in a peer-support group.

¶12 On January 24, however, she returned to PIR for a "well check" and asked for a counseling referral. The record of that visit reflects no concerns by PIR with her mental-health condition. PIR arranged for an assessment to be performed on February 7, but then rescheduled that appointment until February 27, just a week before the adjudication hearing.

¶13 On appeal, DCS argues Mother's delay in engaging with PIR supported "an inference of [her] lingering paranoia." Although it is concerning that Mother broke off from PIR a week after she was released from the hospital, the record does not support DCS's suggestion that she suffered lingering paranoia symptoms. At most, and in contrast to the mania-like symptoms she displayed in November, Mother admitted that she got "depressed for a little while" after leaving the hospital. After Mother reengaged with PIR on January 24, however, her provider noted no apparent mental-health symptoms. Mother "was dressed to occasion, hygiene up kept with clear understandable speech" and "good eye contact." The provider engaged in a logical discussion with Mother, who expressed interest in a counseling referral. At that time, the provider listed counseling as the only barrier to progress.

¶14 After January 24, Mother dutifully took advantage of mental-health treatment through PIR. She kept her appointments, completed a comprehensive assessment, completed a counseling-intake session, engaged in peer-support groups and pursued vocational-rehab assistance. PIR records show no concerns about Mother's mental-health symptoms or about Mother's ability to parent I.B. On February 7, PIR noted that Mother displayed some anxiety. Despite this, Mother engaged in a logical conversation with her PIR provider, who noted the only barrier to progress was her "court/child custody" issue.

¶15 Furthermore, Mother's comprehensive assessment, completed at PIR on February 27, showed Mother had only "moderate depression" and "mild anxiety" and recommended "further assessment" for

the depression. It also noted "[n]o current medical problems reported or detected" and "[n]o emotional, behavioral or cognitive conditions or complications reported or detected." The assessment showed Mother was in the "preparation or action" stage of change, "[w]illing to abstain from all mind-altering substances," and "engaged in [the] treatment process." Notably, the assessment concluded that Mother "is currently stable and has not been [symptomatic] since her first episode in November" of 2018. Likewise, Mother, I.B.'s placement and the case manager testified that Mother had not shown any symptoms like those she experienced in early November.

¶16      The case manager testified at the dependency hearing that Mother had "no real treatment plan." The record shows, however, that PIR developed a treatment plan for Mother that placed her at a voluntary, supportive level of care. Mother's treatment plan included visiting her primary care physician and a registered nurse once per year, seeing a behavioral-health medical professional once every three months, and meeting with her case manager once a month. Mother's plan also included counseling, peer-support groups and vocational rehab. Mother received a copy of the plan, agreed to it and was engaging in the recommended services to the extent possible by the dependency hearing.

¶17      DCS asserts Mother denied her bipolar diagnosis and points to her decision to discontinue medication after leaving the hospital as evidence supporting a dependency at the time of the adjudication hearing. Indeed, the case manager testified that Mother "didn't feel that she needed any help or treatment." But Mother acknowledged her bipolar diagnosis at the dependency hearing. Additionally, PIR knew of Mother's decision not to continue with medication and completed a treatment plan for her that instead required regular oversight by a behavioral-health medical professional. The treatment plan did not foreclose the use of medication, requiring that Mother "will work with PIR to manage symptoms through medication and engagement with services." Mother's testimony reflects this:

> Q: And you were diagnosed with bipolar disorder in November of 2018, correct?
>
> A: Yes.

*    *    *

Q: Are you interested in working on the diagnosis of bipolar to see if you can make sure that you have appropriate therapy and such?

A: Yes.

Q: Okay. When you went to Partners In Recovery, did they suggest a course of treatment for you, for the bipolar . . . ?

A: Yeah. Once I talked to the doctor and we did my intake, she said, what do you think we should do. And I said, I really don't feel like the medications were alleviating symptoms; in fact, I experienced a lot . . . more negative side effects. And she said, . . . depending on how you do with counseling, if you become symptomatic or if you . . . feel like you're anxious or anything, definitely see me, and we'll work out a treatment plan with something small, because I am sensitive to medication. But she said definitely talk to someone and continue to seek peer support and familial support.

Q: Okay. And so the course of treatment was peer support -

A: Counseling.

Q: – counseling, and then medications if necessary.

A: Yes.

¶18      To be sure, under other circumstances, a parent's delay in seeking services, denial of a diagnosis, and refusal to take medication might support a dependency finding, particularly if coupled with evidence of immediate symptoms or recurring episodes that render the parent unable to safely supervise a child or meet a child's needs. Here, however, the record contained no evidence that Mother had any mental-health issues before November 2018 and no reported significant issues afterwards. At the time of the adjudication hearing, Mother had stable employment and housing, which DCS had approved as safe for I.B. Mother lived alone, was no longer maintaining a relationship with her ex-boyfriend, and visited with I.B. almost every day. The child's placement had no concerns about Mother's interactions with I.B., testifying they had all been appropriate and loving.

¶19      At the dependency hearing, DCS presented no evidence that Mother's mental-health issues were likely to render her incapable of

providing I.B. with necessities or proper and effective parental care and control immediately or even in the near future. DCS points to the February 27 comprehensive assessment, in which Mother scored in the moderate range for depression and the mild range for anxiety. Despite these scores, PIR placed her at a low-risk level in all concerning categories, including "Emotional, Behavioral or Cognitive Conditions/Complications" and did not add anything further to Mother's treatment plan. At the hearing, the DCS case manager maintained that "there's no guarantee that tomorrow [Mother] doesn't have another episode or psychotic break." On this record, the case manager's testimony was mere conjecture, and is insufficient to support a finding that DCS had proved I.B. was dependent at the time of the adjudication hearing.

## CONCLUSION

¶20         For the foregoing reasons, we reverse the order adjudicating I.B. a dependent child.

